2015 IL App (1st) 133472

No. 1-13-3472

Fifth Division
March 20, 2015

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| KEVIN E. O'GORMAN and LAURA O'GORMAN, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| v. | ) | |
| | ) | No. 06 L 1567 |
| F.H. PASCHEN, S.N. NIELSEN, INC., an Illinois | ) | |
| Corporation, | ) | The Honorable |
| | ) | Kathy Flanagan, |
| Defendant-Appellee | ) | Judge Presiding. |
| | ) | |
| (Old Veteran Construction, Inc., | ) | |
| Defendant). | ) | |
| | ) | |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Palmer and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1     Kevin O'Gorman (plaintiff) was injured while supervising a construction project at which defendant F.H. Paschen, S.N. Neilsen, Inc., was operating as a general contractor. Plaintiff alleged that he was injured due to the actions of employees of Old Veteran Construction, Inc. (Old Veteran), which was operating as a subcontractor for defendant and which is not a party to the instant appeal. Plaintiff and his wife, Laura O'Gorman, filed suit against both defendant and Old Veteran, alleging that they were negligent and that their negligence was a

cause of plaintiff's injuries. Defendant filed a motion for summary judgment, arguing that it owed no duty to plaintiff, and the trial court granted summary judgment in defendant's favor. Plaintiffs appeal, and we affirm.

¶ 2                                    BACKGROUND

¶ 3                                    I. Complaint

¶ 4        On February 10, 2006, plaintiffs filed a complaint against defendant and Old Veteran; the complaint was amended twice and it was the second amended complaint that was the subject of defendant's motion for summary judgment. The second amended complaint alleges that defendant contracted with the City of Chicago (the City) to act as a general contractor for portions of a construction/renovation project involving the conversion of former police department headquarters into a custodial youth center (the project). Part of defendant's responsibilities included the construction of an elevator shaft within the building. "At all times relevant herewith, Paschen supervised and controlled or was obligated to supervise and control the work for which it contracted, as part of its duties and responsibilities as general contractor, including the construction of the elevator shaft."

¶ 5        Defendant, in turn, retained Old Veteran to act as a masonry subcontractor on the project. Specifically, Old Veteran was hired to perform the masonry work involved in the construction of the elevator shaft, including an extension of the elevator shaft above the existing roofline of the building. "At all times relevant herewith, the defendant, Old Veteran, supervised and controlled or was obligated to supervise and control the work it was doing as Paschen's masonry subcontractor, including the construction of the elevator shaft."

¶ 6        On February 10, 2005, City employees cut a hole in the roof of the building to allow for extension of the elevator shaft above the roofline and placed a wooden cover over the hole.

The second amended complaint alleges that on February 11, 2005, "Old Veteran removed the wooden cover in order to erect and place the courses of cinder block, and it thereafter erected and placed the courses of cinder block." The second amended complaint further alleges that "[w]hen it removed the roof cover originally placed by the City, Old Veteran left a piece of wood, with a nail imbedded therein, upon the roof in proximity to" a roof hatch that was used to access the roof during construction.

¶ 7    Plaintiff was employed by the City and used the roof hatch on February 14, 2005, to access the roof. While attempting to exit the hatch, plaintiff stepped on the piece of wood with the nail embedded therein. In pulling the nail from his foot, plaintiff lost his balance and fell through the hatch opening to the floor below.

¶ 8    The first count of the second amended complaint was for negligence against both defendant and Old Veteran and alleged that defendant was negligent in one or more of the following ways:

"a. Failed to maintain a safe work site;

b. Failed to assure that the roof cover was removed in a safe and appropriate manner;

c. Failed to inspect the work area in which Old Veteran was involved to assure that its work was done in a safe and workmanlike manner;

d. Failed to inspect the work area in which Old Veteran was involved to assure that such was clear of construction waste or debris;

e. Failed to properly dispose of construction waste or debris or see to it that Old Veteran did so;

3

f. Failed to warn the plaintiff and others of the risk inherent in leaving debris on the roof, including the nail imbedded in wood;

g. Failed to place and provide safe, suitable and proper barricades or other fall protection devices for the hatch, or require their use;

h. Failed to warn the plaintiff and others of the risk involved attendant to the [*sic*] its failure to to [*sic*] place barricades or other fall protection devices for the hatch, or require their use;

i. Allowed the plaintiff and others to enter upon the roof when the nail imbedded in wood was present and when there were no fall protection devices for the hatch."

The second amended complaint alleges that, as a result of one or more of these negligent acts or omissions, plaintiff sustained severe injuries.

¶ 9        The second count of the second amended complaint was for loss of consortium against both defendant and Old Veteran.

¶ 10                              II. Discovery

¶ 11                    A. Discovery Deposition of Plaintiff

¶ 12        At his deposition, plaintiff testified that he began working for the City in 1996 as a journeyman carpenter and was currently working as a general foreman of general trades. The "general trades" were "[g]lazers, pipe fitters, sheet metal, carpenters, laborers, [and] iron workers," and plaintiff's responsibility was to coordinate work for the trades under his command at the jobsite. The work that could not be performed by the trades would be contracted out to a general contractor to complete the work. Plaintiff testified that when working on a jobsite, each contactor would have the responsibility of keeping its area clean. Plaintiff did not have the responsibility to supervise the work of any non-City contractors.

Plaintiff's presence on the jobsite would vary, and sometimes he was not present at the site at all, but on average, he visited the jobsite four to six times a week to attend weekly jobsite meetings, check manpower, and check the progress of the work.

¶ 13        Plaintiff testified that one of the tasks performed by City workers on the instant project was the removal of a portion of the building's roof so that the elevator shaft could be extended. Plaintiff instructed his foreman, Anthony Pilas, to perform the work, who, in turn, instructed two additional City employees—Jaime Martinez and Terry Regan—to cut the roof, which took approximately two days.

¶ 14        Plaintiff testified that approximately a week before his accident, the City workers cut the hole in the roof, and sometime between then and February 14, the day of the accident, the elevator shaft was extended by Old Veteran, the masonry subcontractor for defendant. On February 14, plaintiff observed Old Veteran workers on the third floor of the building taking down scaffolding that had been erected inside the elevator shaft. Plaintiff did not observe any Old Veteran workers on the roof.

¶ 15        Plaintiff testified that Tuesday or Wednesday of the week of February 7, he went to the roof of the building to ensure that his workers had properly secured the opening cut into the roof. The opening was covered with 3-by-14 planks across it, then plywood, with "strapping" of 2-by-4s and 1-by-4s nailed to the top of the plywood so that it would not blow away. When the workers cut the hole in the roof, they cleaned up their debris and threw it away into a dumpster located in the parking lot. Plaintiff testified that he accessed the roof via a ladder extending through a roof hatch. When he exited the roof hatch, the elevator shaft would have been a few feet to his left.

¶ 16      Plaintiff testified that on the day of the accident, he climbed the ladder through the roof hatch and stepped to the left upon exiting the hatch. He first stepped with his left foot and landed on a nail embedded in a blonde piece of wood approximately a foot to two feet long; the wood was new and was rectangular in shape, but plaintiff could not recall whether it was a 1-by-4 or a 2-by-4. Plaintiff picked up his left foot and "hopped around trying to pull the nail out." He placed a hand on the roof hatch to steady himself, but did not hold onto the hatch the entire time. As he hopped, plaintiff backed into the curb of the hatch and fell backward, hitting his head on the top of the hatch. When he fell, plaintiff stretched his arms out and caught himself on the sides of the hatch. Pilas and City architect John Albrechet came to plaintiff's side and attempted to assist plaintiff, but were unsuccessful. Plaintiff fell through the hatch 13 to 15 feet to the floor below and lost consciousness.

¶ 17      Plaintiff testified that he had previously complained to defendant about construction debris throughout the building at their regular jobsite meetings. Plaintiff believed the piece of wood and nail came from the cover of the elevator shaft and also believed that someone from Old Veteran disassembled the cover because "[t]hey had to complete their work" of extending the brickwork through the roof. On February 14, the brickwork was above the level of the roof. Plaintiff testified that if someone from Old Veteran wanted a City worker to remove the cover over the elevator shaft, "[h]e would have to go through me." As of the time of the accident, no one from Old Veteran had asked plaintiff to remove the cover.

¶ 18                    B. Testimony From Other City Employees

¶ 19                    1. Discovery Deposition of Terrence Regan

¶ 20      Terrence Regan testified that he was a carpenter for the City's department of general services and worked on the project at issue in the instant case. Pilas was his foreman and was

the person Regan would turn to with any questions about his work. Regan testified that he was involved in cutting a hole in the roof for the extension of the elevator shaft and that plaintiff was the person requesting that Regan cut the hole.

¶ 21    Regan testified that as they were cutting the hole, the workers would stack the old roofing materials to be later discarded. The roofing materials included pieces of wood with nails sticking out of them, and were thrown over the side of the building into the dumpster. All of the wood that was discarded was old wood; there were no new pieces of wood in the roofing material. However, some of the 1-by-4 that was used was newer wood that was blond in color.

¶ 22    Regan testified that Pilas asked the workers to cover the hole. They first laid timbers of 3-by-16 down across the hole and nailed them to the roof deck using nail guns. They then nailed sheets of three-quarter plywood over the timbers, followed by 1-by-4 strapping that was nailed to the timbers through the plywood to hold it down. After the hole was cut and covered, Regan did not return to the roof.

¶ 23    When Regan was presented with a photograph of the roof from February 14, 2005, he identified masonry bricks, covered by plywood with cinder blocks on top of the plywood, in the area where he had cut the hole in the roof. He testified that the bricks, plywood, and cinder blocks were not the cover he had placed over the hole and that the cover had "definitely" been removed since he had installed it.

¶ 24                    2. Discovery Deposition of John Albrecht

¶ 25    John Albrecht testified that he was formerly an architect with the City's department of general services. He served as a coordinating architect on the project at issue in the instant case and "was responsible for the design issues as they arose and making sure the architect

would address those issues as they arose." He visited the worksite every two weeks and tried to attend the regular construction meetings; Albrecht recalled plaintiff making general complaints about the cleanliness of the worksite at the meetings.

¶ 26    On February 14, 2005, Albrecht visited the worksite to inspect a heating and air conditioning unit on the roof of the building. When he arrived at the building, he met with plaintiff and Pilas and they headed for the roof. Albrecht and Pilas went to the roof via a ladder to the roof hatch, while plaintiff was temporarily delayed on the third floor. By the time plaintiff climbed to the roof, Albrecht and Pilas had moved to the side of the heating and air conditioning unit and did not observe him climbing through the hatch. Albrecht observed plaintiff on the roof near the hatch, balancing on one foot while pulling a piece of wood with a nail embedded in it out of his other foot. Albrecht described the piece of wood as approximately six inches, but could not recall whether it was a "two by two or three or four"; Albrecht testified that "[i]t was definitely new wood, so it looked like a construction scrap to me."

¶ 27    Albrecht and Pilas had begun walking back in plaintiff's direction and began hurrying when they observed plaintiff in distress. Plaintiff was able to remove the piece of wood, but lost his balance and fell backward into the hatch. Albrecht ran to plaintiff, who was holding himself up by his arms and legs. Albrecht grabbed plaintiff's sweater and Pilas grabbed plaintiff's right foot; plaintiff's sweater began slipping, so Albrecht then grabbed plaintiff's left foot. The upper part of plaintiff's body slipped, so that plaintiff was hanging head down through the hatch. Albrecht could not hold on and plaintiff fell through the hatch to the third floor.

¶ 28                              3. Discovery Deposition of Anthony Pilas

¶ 29        Anthony Pilas testified that he was an acting carpentry foreman for the City on the project at issue in the instant case. Pilas testified that the only work that City carpenters performed on the roof of the building was to cut a hole in the roof for the extension of the elevator shaft and further testified that the City carpenters would "[a]bsolutely" be responsible for cleaning up that debris.

¶ 30        Pilas was present on the roof when the City workers cut the hole and testified that the roofing materials were removed in pieces then discarded. The materials would be brought down by way of a scissors lift; City employees were not permitted to throw the roofing materials off the roof into the dumpster on the side of the building. The hole was then secured by a temporary frame made of large timbers covered with plywood; Pilas was not present when the cover was created or installed, but testified that the plywood would have been nailed or screwed to the timbers. Pilas never witnessed any mason remove the cover placed over the shaft by the City workers.

¶ 31        On the day of the accident, Pilas was at the site with plaintiff and they were going to the roof with Albrecht, who wished to inspect the chiller unit on the roof. Pilas climbed the ladder to the roof first, followed by Albrecht and then plaintiff; there was no one else on the roof at the time. Pilas observed debris on the roof, including rope, roofing paper, 2-by-4s, plywood, and buckets; Pilas did not know who put the debris on the roof, but testified that there was no debris on the roof when the City workers finished cutting the hole for the elevator shaft. Pilas and Albrecht were near the chiller unit when plaintiff stepped onto the roof. Pilas observed plaintiff come onto the roof and "all of a sudden he stepped on something" and began screaming that he had stepped on a nail. Pilas observed plaintiff

reaching down to pull it out, then falling into the hatch. Pilas held onto to plaintiff's hand and Albrecht grabbed plaintiff as well. Plaintiff began flailing his arms and Pilas lost hold of his hand. Plaintiff then fell through the opening and Pilas immediately called 911. Pilas testified that plaintiff stepped on a piece of 2-by-4 wood that was approximately four inches long.

¶ 32          4. Discovery Deposition of Anthony Acres

¶ 33          Anthony Acres testified that he worked for the City's department of general services as a construction laborer and worked on the construction project at issue in the instant case. Acres was present on the roof when the City carpenters were cutting the hole over the elevator shaft. The cutting generated debris, including pieces of wood with nails sticking out from them. The debris was placed near the work area while the carpenters were cutting. Acres' job was to periodically clean up all of the debris and throw it over the edge of the roof into the dumpster below.

¶ 34          Acres testified that one of the carpenters created a cover and affixed it to the hole they cut into the roof. Once the carpenters were finished, they left and Acres disposed of all the debris left.

¶ 35          C. Testimony From Old Veteran Employees

¶ 36          1. Discovery Deposition of Jesus Cruz

¶ 37          Jesus Cruz testified that he was a superintendent for Old Veteran and was responsible for completion of work as well as "all aspects of safety for [the] workers," including compliance with the Occupational Safety and Health Act (OSHA) (29 U.S.C. § 651 *et seq.* (2006)). Cruz had completed a 10-hour OSHA class and had received additional safety training through his union. Old Veteran also had a safety plan that Cruz discussed with the workers under his

supervision. In addition to his position as a superintendent, Cruz also performed tuckpointing work for Old Veteran.

¶ 38    Cruz testified that his brother Salvador was the superintendent assigned to the construction project at issue in 2004 and 2005. Cruz was employed on the project as a tuckpointer and was responsible for overseeing the work on the elevator shaft when Salvador was in Mexico between November 2004 and March 2005. Old Veteran had been retained as a subcontractor on the project by defendant, and while Cruz was overseeing for work for Salvador, Cruz met Gary Swart, defendant's superintendent. Cruz was overseeing the work during the time that the elevator shaft was extended through the roofline and had visited the roof, "inspecting if everything was going correctly, everything was going fine, cleanup, everything—they had enough material and everything to complete the job." Cruz visited the worksite once or twice a week and went to the roof twice.

¶ 39    Cruz testified that when he was on the roof, he did not observe any plywood on the roof but observed that "Forty, 50 percent of the roof" contained discarding roofing material. Cruz further testified that if the Old Veteran workers discovered the elevator shaft covered by nailed boards, they would ask Swart to remove the boards; nobody made such a request of Swart during the project. However, if the workers observed the shaft covered by plywood with masonry blocks on it, they would simply remove the blocks and the plywood.

¶ 40    Cruz testified that Old Veteran's workers had no need to use any nails to do their work on the elevator shaft and would have no reason to break any wood that had nails embedded in it and leave it on the roof. Cruz further testified that the Old Veteran workers understood that they were responsible for cleaning up after themselves and performing any "housekeeping." If Cruz had observed any debris, even if not caused by Old Veteran's workers, he would have

11

brought it to someone's attention or had it removed. Similarly, Cruz would expect any of Old Veteran's workers to bring to his or Swart's attention any safety hazard they observed in the area in which they were working, even if that hazard was created by someone else.

¶ 41                          2. Discovery Deposition of Paul Noble

¶ 42         Paul Noble testified that he was a bricklayer for Old Veteran on the construction project at issue in the instant case and that he and Adelbert Norwood added three rows of eight-inch masonry block to the existing elevator shaft. Noble testified that he added the rows of masonry block from the inside of the elevator shaft, while Norwood was on the roof. There was no covering over the elevator shaft when Noble arrived, nor did he or Norwood cover the elevator shaft when they left. He testified that the shaft should not have been left uncovered, so the laborers working with Noble and Norwood should have covered the shaft; however, he was unaware of anything that happened before or after he left the shaft.

¶ 43         Noble testified that he received his instructions to do the roofing work from Salvador Cruz and did not speak to anyone from defendant's office; Noble did not know either Swart or David Roy, defendant's project manager.

¶ 44                       3. Discovery Deposition of Adelbert Norwood

¶ 45         Adelbert Norwood testified that he retired in 2004, but performed odd jobs, including working for Old Veteran as a bricklayer to extend the elevator shaft on the project at issue in the instant case. He was asked to work by Salvador Cruz, and he and Noble added three courses of eight-inch masonry block to the elevator shaft. They were assisted by two laborers, but Norwood was unable to recall their names.

¶ 46         Norwood testified that he added the courses of block from the roof, which he accessed through the nearby roof hatch. When he came onto the roof, the elevator shaft was

uncovered. Norwood identified three-quarter inch plywood covering the elevator shaft in a photograph he was shown as an exhibit, but testified that "[i]t wasn't there when I was there." Norwood did not cover the shaft when they were done and was unaware of whether the laborers did so. Norwood did not observe any debris around the elevator shaft.

¶ 47    Norwood was unaware of the company for which Old Veteran was providing masonry work and did not know Swart or Roy.

¶ 48                          4. Discovery Deposition of Jose Maldonado

¶ 49    Jose Maldonado testified that he was the owner of Old Veteran and that under Old Veteran's subcontract with defendant, Old Veteran employees were responsible for cleaning up after themselves when they installed the elevator shaft; nobody else was responsible for cleaning up after Old Veteran. Maldonado testified that it was Old Veteran's practice to dispose of garbage daily and Old Veteran employees would not leave garbage behind when they left for the day.

¶ 50    Maldonado testified that he would expect the company that cut the hole in the roof to have covered it. If such a cover was present, then the company that cut the hole would be required to remove it for Old Veteran workers to complete their work and would replace it afterwards; "[t]hat's normally how the procedure's followed." The Old Veteran workers would not have been permitted to remove the cover as "that's against our regulations."

¶ 51    Maldonado testified that Swart would call him when defendant needed work done. Swart did not tell Old Veteran how to do its work and did not direct the means and methods of the work.

13

¶ 52                              D. Testimony From Defendant's Employees

¶ 53                              1. Discovery Deposition of Gary Swart

¶ 54        Gary Swart testified that he was a superintendent for defendant and served in that capacity on the construction project at issue in the instant case. His responsibilities as superintendent were to "[s]chedule my subcontractors, keep an eye on the job they performed, basically be safety guy, that type of stuff." Swart had completed a 10-hour OSHA training course in 2000 and a 30-hour OSHA training course in 2002.

¶ 55        Swart testified that his responsibilities on the worksite included making sure that the subcontractors kept the worksite clean and safe and to identify any potential violations of OSHA. During the course of the project, he would walk the jobsite daily, including areas in which defendant's subcontractors were working. If he observed a safety hazard that had been created by defendant's subcontractor, "I would be responsible for it. I would have to have my contractors clean it." Similarly, if he observed the subcontractors doing something wrong, he would instruct them to "fix it" and if he observed them doing something unsafe, he would order them to stop. Swart testified that he would not be responsible for cleaning up areas worked on by a different general contractor, such as the City.

¶ 56        Swart testified that defendant's project manager for the project was David Roy, and Roy visited the site weekly, typically on the days that there were meetings relating to the site. Leo Wright was a senior project manager for defendant's "JOC division" and visited the site "[o]ccasionally."

¶ 57        Swart testified that defendant had a safety plan and that he would consult the safety plan as specific issues occurred onsite. He further testified that it was his responsibility to enforce

14

defendant's safety manual at the jobsite. If a subcontractor encountered a safety hazard, Swart would expect the subcontractor to bring it to his attention.

¶ 58    Swart testified that there were regular Tuesday meetings for the jobsite concerning "[c]oordination and job schedule," as well as problems on the jobsite. These meetings would be attended by "[l]ots of different people," including plaintiff and many others from the City. Swart did not recall any complaints as to defendant's or Old Veteran's work at the meetings.

¶ 59    Swart testified that he spoke to the Old Veteran workers on February 11 about finishing up their work that day. Swart spoke to the workers on the third floor of the building and was able to observe sunlight through the elevator shaft, indicating that there was no cover over the shaft. Swart instructed the workers to cover the hole in the roof when they left. Swart believed that after the City workers cut the hole in the roof for the elevator shaft, they covered it, because it was "just basic common sense that you wouldn't leave a big gaping hole in the roof." Swart testified that if the City workers had nailed the cover to the hole, Old Veteran workers could have removed the cover using their hammers and would not have needed to ask his permission, but further testified that he was not aware of whether the cover had been nailed down; Swart later testified that the hammers that the Old Veteran workers carried were masonry hammers, which did not have a "claw" end to remove nails but instead had a "chisel" end.

¶ 60    Swart testified that on February 14, 2005, he arrived at the worksite at approximately 7 a.m. and left at approximately 11 a.m. Upon arriving, Swart noticed that it was raining and searched for his two laborers inside the elevator shaft, who were the only subcontractors defendant had on site that day. Swart observed them for approximately five minutes, "[j]ust long enough to make sure they were there on site doing what I needed," which was cleaning

out the interior of the elevator shaft. Swart then generally checked the stairwell, which was empty due to the rain, and sat in his vehicle completing paperwork and making phone calls.

¶ 61 At approximately 10:30 a.m., Swart was in his vehicle preparing to leave the worksite when he observed a fire truck pulling in. As this was an unusual occurrence, Swart "figured I better go back in and see what's going on." Swart was standing in the building's foyer when he learned of plaintiff's accident. Pilas informed Swart that plaintiff had stepped on a nail and in the process of jumping on one foot to remove the nail, plaintiff fell through the roof hatch. Pilas further informed Swart that Pilas and Albrecht had tried to hold onto plaintiff as long as possible but that plaintiff "pulled away" and fell through the hatch.

¶ 62 Swart spoke to David Roy, his boss, who asked him to take photographs of the roof and to try to locate the piece of wood. Swart remained in the foyer for 30 to 45 minutes, then went to the roof to try to locate the board that plaintiff had stepped on and was unable to locate it. Pilas had informed Swart that plaintiff stepped on a "small piece of wood with a nail in it." After 5 to 10 minutes, Swart left the worksite. When Swart went to the roof, he observed that the extended elevator shaft was covered with plywood held down by cinder blocks.

¶ 63 Swart testified that the Old Veteran workers would not have been on the roof that day because "they had no reason to be on the roof," since they were cleaning the elevator shaft and disassembling the scaffolding inside it, which did not require access to the roof.

¶ 64 2. Discovery Deposition of Leo Wright

¶ 65 Leo Wright testified that he was currently vice president with defendant but that he had formerly been Chicago job order contracting division manager, a position which concerned term contracts with the City. Wright testified that defendant had a four-term contract with the

16

City's department of general services and that as part of the contract, defendant agreed to be bound by the City's general conditions.

¶ 66    Wright testified that Swart was defendant's superintendent on the project at issue in the instant case, and David Roy was defendant's project manager. Wright's responsibilities were "to manage my project managers and superintendents, review budgets, review subcontracts, establish manpower for each contract, be the liaison with the owners." As superintendent, Wright would have expected Swart "to visit [the site] on a regular basis, being daily or multiple times during the day if required depending on what activities were happening at the time, ensuring that subcontractors were putting work in place correctly, general housekeeping and to track the progress." Wright testified that "general housekeeping" included making sure that any of defendant's subcontractors were cleaning up after themselves and not leaving any debris.

¶ 67    Wright testified that under the general conditions of defendant's contract with the City, defendant was required "to take all precautions that might be necessary to render all portions of the work secure in every respect or to decrease the liability of accidents from any cause or to avoid contingencies which are liable to delay the completion of the work." Defendant also agreed to be "solely responsible for safety" and had "sole and complete responsibility for implementation of a safety program." Finally, defendant agreed that during construction, it would "keep the work site and adjacent premises as free from material, debris and rubbish as [was] practicable and, when directed, would immediately remove same entirely when *** such material, debris or rubbish constitute[d] a nuisance, a safety hazard or [was] objectionable in any way to the public."

¶ 68                                    3. Discovery Deposition of David Roy

¶ 69        David Roy testified that he was a project manager for defendant on the construction

project at issue in the instant case. Roy testified that it was a subcontractor's responsibility to

dispose of debris in the immediate work area as work progressed, but the subcontractor

would not be responsible for cleaning up another subcontractor's work. In that case,

however, the subcontractor would have the obligation to alert someone of the debris.

¶ 70                                            III. Contract

¶ 71        The record on appeal contains the subcontract agreement between defendant and Old

Veteran, entered into on April 9, 2004. Paragraph 2 of the subcontract agreement provides

that "the provisions of the contract between the Contractor and the Owner (hereinafter the

'General Contract') including but not limited to, the General and Supplementary Conditions,

the Plans and Specifications, all Contract Requirements, and the particular Specifications

relating to the Work of Subcontractor, insofar as they are applicable, are hereby incorporated

herein by this reference and are binding upon the Subcontractor."

¶ 72        Paragraph 19 of the subcontract agreement is entitled "Safety" and provides in relevant

part:

>        "Subcontractor agrees and understands that neither Contractor nor Architect will
>
>        make continuous or exhaustive inspections to assure Subcontractor's compliance with
>
>        applicable safety rules, regulations or requirements. Subcontractor shall be solely
>
>        responsible to assure the safety of its own equipment, appliances, material, and
>
>        working conditions, techniques, and procedures, and Contractor is not responsible in
>
>        any manner for the safety of Subcontractor's Work. If the Subcontractor fails to
>
>        correct unsafe procedures, acts or conditions within a reasonable time of notification

by Contractor, however, Contractor may (but has no contractual obligation to do so) correct the unsafe practice and backcharge the Subcontractor for these costs. Repeated failures to correct unsafe practices may result in the termination of this Agreement. In the event Contractor receives a penalty from OSHA as a result of a violation of OSHA by Subcontractor and Contractor is cited under the multi-employer worksite rule, Subcontractor agrees to defend, indemnify and hold harmless Contractor for the imposition of any fines and/or penalties."

¶ 73    Paragraph 20 of the subcontract agreement is entitled "Clean-Up" and provides, in full:

"a) Subcontractor shall, at its own cost and expense [1)] keep the premises free at all times from all waste materials, packing materials and other rubbish generated by Subcontractor in locations or containers as designated by Contractor, 2) clean and remove from its own Work and from all contiguous work areas any soiling, staining, mortar, plaster, concrete, or dirt resulting from the execution of its Work in each area, 3) perform such cleaning as may be required to leave the Work area 'broom clean' and 4) at the completion of its Work, remove all of its tools, equipment, scaffolds, shanties, and surplus materials and perform final clean-up as required by Contractor.

b) If the Subcontractor is lax in its cleaning, the Contractor will give notice to the Subcontractor's field personnel and written notice to the Subcontractor that the cleaning is not being kept current. If after twenty four hours (24) notice, Subcontractor has failed to abide with clean-up requirements, Contractor shall perform the Subcontractor's cleaning and backcharge the Subcontractor for the costs."

¶ 74                                    IV. Motion for Summary Judgment

¶ 75        On July 23, 2013, defendant filed a motion for summary judgment. Defendant argued, first, that plaintiffs had provided no evidence establishing that the debris upon which plaintiff stepped was created by defendant or by Old Veteran and, therefore, defendant owed no duty to plaintiff. Instead, defendant claimed that all facts pointed to City employees as the source of the nail-embedded piece of wood. Defendant also argued that it owed no duty to plaintiff because it had delegated safety and housekeeping responsibilities to Old Veteran.

¶ 76        On August 26, 2013, the trial court granted defendant's motion for summary judgment. The court noted that there was no allegation that defendant created the debris that caused plaintiff's injury and that defendant's liability was based on its role as the general contractor of the project and its duty to maintain safety at the worksite. The court found that while plaintiff referenced the duties delineated in the contract between defendant and the City, it was the subcontract between defendant and Old Veteran that was at issue. The subcontract between defendant and Old Veteran delegated the responsibility for jobsite safety and cleanup to Old Veteran; the court also noted that the contract between the City and defendant did not prohibit this delegation of duty.

¶ 77        The court also noted that a general contractor requiring OSHA compliance by a subcontractor did not create a duty on the part of the general contractor to ensure that those standards were met, and there was nothing in the record to indicate that defendant in any way attempted to assert or exercise any control over the safety or cleanliness of Old Veteran's work. Consequently, the court found that defendant owed no duty to plaintiff and that summary judgment in defendant's favor was appropriate. The court further found that there was no just reason to delay the enforcement or appeal of its order.

¶ 78　　　　Plaintiffs filed a motion to reconsider on September 25, 2013, which was denied on October 4, 2013. This appeal follows.

¶ 79　　　　　　　　　　　　　　　　ANALYSIS

¶ 80　　　　On appeal, plaintiffs argue that the trial court erred in granting summary judgment in defendant's favor on the basis that defendant owed no duty to plaintiff. As an initial matter, defendant raises several issues with plaintiffs' brief on appeal, primarily with the brief's lack of citation to the record on appeal. Defendant argues that plaintiffs' statement of facts violates Illinois Supreme Court Rule 341(h)(6) (eff. Feb. 6, 2013), which requires the statement of facts to be "stated accurately and fairly without argument or comment, and with appropriate reference to the pages of record on appeal," and makes a similar argument with respect to several areas of the argument portion of plaintiffs' brief. Plaintiffs' brief lacks citations to the record in the first six pages of the statement of facts and the recitation of the provisions of defendant's contract with the City combines portions of several provisions summarized under plaintiffs' descriptive captions. While we may strike the statement of facts or dismiss the appeal due to violations of Rule 341(h)(6), we will not do so in the instant case as plaintiffs' violations do not hinder our review. See *Szczesniak v. CJC Auto Parts, Inc.*, 2014 IL App (2d) 130636, ¶ 8. However, we will disregard the noncompliant portions of plaintiffs' statement of facts in our review. *Szczesniak*, 2014 IL App (2d) 130636, ¶ 8. We reach a similar result as to the lack of citations in the argument portion of plaintiffs' brief. We now turn to the merits of plaintiffs' appeal.

¶ 81　　　　A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." 735 ILCS 5/2-1005(c) (West 2008). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 82      "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). A defendant moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The defendant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). In other words, there is no evidence to support the plaintiff's complaint.

¶ 83      " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 84    In the case at bar, plaintiffs challenge the trial court's finding that defendant owed plaintiff no duty as a matter of law. Plaintiffs' theory of recovery is grounded in common-law negligence. "The essential elements of a cause of action based on common-law negligence are the existence of a duty owed by the defendant to the plaintiff, the breach of that duty, and the injury proximately caused by that breach." *Cochran v. George Sollitt Construction Co.*, 358 Ill. App. 3d 865, 873 (2005) (citing *Ward v. K mart Corp.*, 136 Ill. 2d 132, 140 (1990)). As noted, here, plaintiffs' arguments focus on the duty element. "Whether there is common law negligence, in the context of a construction-related injury, is analyzed under section 414 of the Restatement (Second) of Torts." *Kotecki v. Walsh Construction Co.*, 333 Ill. App. 3d 583, 587 (2002) (citing *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051, 1057-58 (2000)).

¶ 85    I. Section 414 of the Restatement (Second) of Torts

¶ 86    "Generally, one who employs an independent contractor is not liable for the latter's acts or omissions." *Joyce v. Mastri*, 371 Ill. App. 3d 64, 73 (2007) (citing *Downs v. Steel & Craft Builders, Inc.*, 358 Ill. App. 3d 201, 204-05 (2005)). However, section 414 of the Restatement (Second) of Torts (1965), "which has long been recognized as an expression of law in Illinois," provides an exception to the general rule, referred to as the "retained control" exception. *Cochran*, 358 Ill. App. 3d at 873-74 (citing *Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 325 (1965)); *Calloway v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 112746, ¶ 47.

¶ 87    Section 414 provides:

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose

safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965).

¶ 88    "The Restatement describes a continuum of control, explaining [that] the employer is subject to liability as master under the principles of agency where the employer retains control over the operative detail of any part of the contractor's work. [Citation.] If the employer retains only supervisory control, *i.e.*, power to direct the order in which work is done, or to forbid its being done in a dangerous manner, then the employer is subject to liability under section 414 unless he exercised supervisory control with reasonable care." *Martens v. MCL Construction Corp.*, 347 Ill. App. 3d 303, 314 (2004) (citing Restatement (Second) of Torts § 414, cmt. a (1965)). Thus, "[a]s comment *a* to section 414 clarifies, the general contractor, by retaining control over the operative details of its subcontractor's work, may become vicariously liable for the subcontractor's negligence; alternatively, even in the absence of such control, the general contractor may be directly liable for not exercising his supervisory control with reasonable care." *Cochran*, 358 Ill. App. 3d at 874.

¶ 89    However, the "retained control" concept is limited by comment c to section 414:

    "In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There

24

must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414, cmt. c (1965).

Thus, negligence and, specifically, the existence of a duty under section 414 "turn[] on whether the defendant controls the work in such a manner that he should be held liable." *Martens*, 347 Ill. App. 3d at 315; *Calloway*, 2013 IL App (1st) 112746, ¶ 50. "Whether a contractor retained such control over a subcontractor's work so as to give rise to liability is an issue reserved for a trier of fact, unless the evidence presented is insufficient to create a factual question." *Joyce v. Mastri*, 371 Ill. App. 3d 64, 74 (2007) (citing *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051, 1059 (2000)).

¶ 90   In the case at bar, the trial court found that defendant had not retained control over Old Veteran's work as a matter of law. On appeal, plaintiffs argue that defendant exerted sufficient control over Old Veteran's work for direct liability under section 414. We note that while plaintiffs make a reference to vicarious liability in the "Issues Presented for Review" section of their brief, they make no arguments concerning vicarious liability in the argument section of their brief. Accordingly, we do not consider it in our analysis. *Roiser v. Cascade Mountain, Inc.,* 367 Ill. App. 3d 559, 568 (2006) (by failing to offer supporting legal authority or "any reasoned argument," plaintiffs waived consideration of their theory for asserting personal jurisdiction over defendants); *People v. Ward,* 215 Ill. 2d 317, 332 (2005) ("point raised in a brief but not supported by citation to relevant authority *** is therefore forfeited"); *In re Marriage of Bates,* 212 Ill. 2d 489, 517 (2004) ("A reviewing court is entitled to have issues clearly defined with relevant authority cited."); *Ferguson v. Bill Berger, Associates, Inc.,* 302 Ill. App. 3d 61, 78 (1998) ("it is not necessary to decide this

question since the defendant has waived the issue" by failing to offer case citation or other support as Supreme Court Rule 341 requires); Ill. S. Ct. R 341(h)(7) (eff. Feb. 6, 2013) (argument in appellate brief must be supported by citation to legal authority and factual record).

¶ 91                                II. Direct Liability Under Section 414

¶ 92        As noted, "the general contractor may be directly liable for not exercising his supervisory control with reasonable care," even in the absence of control sufficient to subject the general contractor to vicarious liability. *Cochran*, 358 Ill. App. 3d at 874. Here, plaintiffs argue that they presented at least a question of fact as to direct liability under section 414 because (1) the contract between defendant and the City contemplated close supervision and control by defendant and (2) defendant took an active role in scheduling and coordinating the work and in safety matters.

¶ 93        Plaintiffs first argue that the trial court erred in not giving any consideration to the contract between defendant and the City, which provided that even if the City consented to the general contractor's use of a subcontractor (as occurred in the instant case), "in no [event] shall such consent relieve the Contractor from his obligations, or change the terms of the Contract." We do not find this argument persuasive.

¶ 94        While defendant's contract with the City made defendant responsible for the safety of the work, defendant's subcontract with Old Veteran delegated this duty to Old Veteran. Plaintiffs point to no provision of the contract prohibiting such a delegation. The subcontract provides that the provisions of the contract between the City and defendant were binding upon Old Veteran and expressly provides that "Subcontractor shall be solely responsible to assure the safety of its own equipment, appliances, material, and working conditions, techniques, and

procedures, and Contractor is not responsible in any manner for the safety of Subcontractor's Work." "The best indicator of whether a contractor has retained control over the subcontractor's work is the parties' contract, if one exists." *Downs v. Steel & Craft Builders, Inc.*, 358 Ill. App. 3d 201, 205 (2005); *Wilfong v. L.J. Dodd Construction*, 401 Ill. App. 3d 1044, 1061 (2010). Here, the contract demonstrates that defendant did not retain control over Old Veteran's conduct. Accordingly, the trial court did not err in giving the subcontract more weight than the contract between defendant and the City.

¶ 95    Furthermore, we cannot agree with plaintiffs' contention that defendant took an active role in scheduling and coordinating the work and in safety matters. While defendant coordinated the schedules of the subcontractors, this is not sufficient for direct liability. The deposition testimony indicates that defendant never directed the manner in which Old Veteran employees performed their work. For instance, Swart, defendant's superintendent, testified that on the day of plaintiff's accident, he observed Old Veteran's workers for approximately five minutes, "[j]ust long enough to make sure they were there on site doing what I needed," which was cleaning out the interior of the elevator shaft. Swart then generally checked the stairwell, which was empty due to the rain, and sat in his vehicle completing paperwork and making phone calls. Additionally, Maldonado, the owner of Old Veteran, testified that Swart did not tell Old Veteran how to do its work and did not direct the means and methods of the work. The two bricklayers responsible for extending the elevator shaft, Noble and Norwood, testified that they did not speak to anyone from defendant's office and did not even know who Swart or Roy were; they further testified that they received direction only from Old Veteran's superintendent. Accordingly, there is no evidence that

Swart or anyone else from defendant's office ever directed the manner in which Old Veteran workers performed their work.

¶ 96    We find the cases relied on by plaintiffs to be factually distinguishable. For instance, in *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051, 1063 (2000), the subcontract between the general contractor and the subcontractor purported to leave the subcontractor in control of its work, but nevertheless "went to great lengths to control the safety standards at the work site." Additionally, the general contractor's actions "indicated a substantial level of involvement in the incidental activities at the work site," with a full-time safety manager conducting weekly safety meetings and checking for compliance, as well as having the power to halt the subcontractors' work if there were safety violations. *Bokodi*, 312 Ill. App. 3d at 1063. The general contractor was also authorized "to instruct the subcontractors' employees to comply with safety standards in even the most minute details." *Bokodi*, 312 Ill. App. 3d at 1063. Finally, "due to the fact that defendants were constantly monitoring this work site," they should have known of the methods employed in the case that led to the plaintiff's injury. *Bokodi*, 312 Ill. App. 3d at 1063.

¶ 97    Similarly, in *Wilkerson v. Paul H. Schwendener, Inc.*, 379 Ill. App. 3d 491, 497 (2008), "[a]lthough the contract between Monarch [(the subcontractor)] and defendant [(the general contractor)] seemingly left to Monarch control of the operative details of its work and the safety of its employees, defendant's actions on the jobsite show defendant retained more than a general right of supervision." The court specifically pointed to a letter asserting the defendant's discretionary authority to stop the subcontractor's work as the "best evidence" of the control, and also noted that the subcontractor had a contractual obligation to attend safety meetings, to comply with the defendant's list of 21 safety procedures, and to submit for the

defendant's approval a site-specific safety plan and minutes of the subcontractor's own weekly safety meetings. *Wilkerson*, 379 Ill. App. 3d at 497.

¶ 98   Likewise, in *Aguirre v. Turner Construction Co.*, 501 F.3d 825, 831 (7th Cir. 2007), the Seventh Circuit noted that, as in *Bokodi*, the subcontract placed the subcontractor in control of its work but the actions of the general contractor demonstrated retained control. The court pointed to specific safety and design requirements, regular monitoring and the authority to halt unsafe work, and further noted that the general contractor required the subcontractor to follow 23 rules specific to scaffold construction and that the general contractor had imposed specific alternative design requirements on the scaffold that led to the plaintiff's injury. *Aguirre*, 501 F.3d at 830-31.

¶ 99   In the case at bar, by contrast to the three cases cited by plaintiffs, the subcontract leaves to Old Veteran the control of its work and does not purport to control the safety standards at the work site. Indeed, the subcontract specifically notes that "neither Contractor nor Architect will make continuous or exhaustive inspections to assure Subcontractor's compliance with applicable safety rules, regulations or requirements," making the subcontract almost the opposite of the one at issue in *Bokodi*. Additionally, there was no evidence that anyone from defendant's office conducted safety meetings or attempted to control safety in any way. Finally, there was no evidence that anyone from defendant's office was aware of any debris left on the roof.

¶ 100   Finally, we note that there is no evidence that defendant knew or should have known of the alleged safety violation. "According to comment *b* to section 414, the general contractor's knowledge, actual or constructive, of the unsafe work methods or a dangerous condition is a precondition to direct liability." *Cochran*, 358 Ill. App. 3d at 879-80; *Lee v. Six*

29

*Flags Theme Parks, Inc.*, 2014 IL App (1st) 130771, ¶ 102; *Calderon v. Residential Homes of America, Inc.*, 381 Ill. App. 3d 333, 347 (2008). Thus, in *Cochran*, we found that the general contractor was not directly liable for a worker's injury in falling off an unsafe ladder where the unsafe condition was in existence for an hour at most and the general contractor had no knowledge of the unsafe condition. *Cochran*, 358 Ill. App. 3d at 880.

¶ 101　　　In the case at bar, we note that it is not clear whether the nail was even left by Old Veteran employees or the precise day that the nail was left on the roof, as no one testified that he or she was actually present when the nail was left on the roof. Additionally, none of defendant's employees went onto the roof until after plaintiff's accident, when Swart went to the roof to try to locate the nail. Accordingly, in the absence of any evidence as to actual or constructive knowledge of Old Veteran's allegedly unsafe work methods, there can be no direct liability against defendant.

¶ 102　　　　　　　　　　　　　　　　CONCLUSION

¶ 103　　　For the reasons set forth above, the trial court did not err in granting summary judgment in defendant's favor.

¶ 104　　　Affirmed.