2015 IL App (1st) 140933

Nos. 1-14-0933, 1-14-2102 (cons.)

Fifth Division
September 18, 2015

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| JORGE CABRERA, | ) | |
| | ) | |
| | ) | Appeal from the Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County. |
| | ) | |
| v. | ) | No. 11 L 9036 |
| | ) | |
| ESI CONSULTANTS, LTD., MILHOUSE | ) | The Honorable |
| ENGINEERING AND CONSTRUCTION, INC., and | ) | Kathy Flanagan, |
| THE CITY OF CHICAGO, | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff Jorge Cabrera was injured while working on a construction project on the

Washington Street Bridge in Chicago (the project). His employer, Era Valdivia Contractors,

Inc. (Era Valdivia), had contracted with the City of Chicago (the City) to perform certain

work associated with the project, including sandblasting and painting the bridge. The City

had also contracted with ESI Consultants, Ltd. (ESI),[1] to serve as an engineering consultant

on the project. ESI, in turn, subcontracted with Milhouse Engineering and Construction, Inc.

_____

[1] At the time the parties entered into the contract, ESI was known as K-Plus Engineering.

(Milhouse), to serve as subconsultant. On August 30, 2011, plaintiff filed a negligence lawsuit against the City and later amended the complaint to include negligence counts against Milhouse and ESI. The trial court granted summary judgment in favor of the City, ESI, and Milhouse and plaintiff appeals. We affirm.

¶ 2                                    BACKGROUND

¶ 3                                    I. Complaint

¶ 4        On August 30, 2011, plaintiff filed a complaint against the City; he later amended the complaint on April 11, 2012, to include counts of negligence against Milhouse and ESI. The first amended complaint was the subject of defendants' motions for summary judgment.

¶ 5        Count I of the first amended complaint was against the City for negligence and alleges that on September 2, 2010, the City was the owner and project manager engaged in the erection and construction of bridge and street improvements located at the intersection of Washington Street and Wacker Drive in Chicago. The City had contracted with Era Valdivia, plaintiff's employer, to perform certain work associated with the project. On September 2, 2010, plaintiff was performing his duties as a laborer and slipped on oil located under the bridge, falling approximately 25 feet and causing multiple injuries. Count I alleges that the City had a presence on the project and was in control of the work, had authority over the means used to perform the work, had authority over safe work practices, and had a duty to exercise reasonable care to avoid the creation and/or existence of hazardous conditions at the work site and owed such a duty to plaintiff. Count I further alleges that it was the custom and practice in the construction industry for a project manager to ensure that its project was free and clear of safety hazards, including fall hazards, and that all work surfaces were to be free

2

and clear from slip hazards, including oil. Count I alleges that plaintiff's fall and resulting injuries were the direct and proximate result of the City's negligence.

¶ 6     Count II of the first amended complaint was against the City for negligence based on section 343 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 343 (1965)), which concerned the City's duties to use due care as a possessor of land to its invitees. Count II alleges that because the City possessed the land where plaintiff was injured, it owed him a duty to keep the area free from dangerous conditions and alleges that the City knew of, or in the exercise of reasonable care should have discovered, the oil under the bridge, which posed an unreasonable risk of harm to plaintiff.  Count II alleges that plaintiff's fall and resulting injuries were the direct and proximate result of the City's breach of its duty to use due care.

¶ 7     Count III of the first amended complaint was against Milhouse for negligence and alleges that Milhouse was the entity engaged in the inspection, management, control, operation, supervision, and coordination of the erection, renovation, repair, and construction of the project and that Milhouse had contracted with Era Valdivia and/or the City to perform various inspection and labor work associated with the project. Count III alleges the same theories of negligence against Milhouse as count I does against the City.

¶ 8     Finally, count IV of the first amended complaint was against ESI for negligence and alleges that ESI was the entity engaged in the inspection, management, control, operation, supervision, and coordination of the erection, renovation, repair, and construction of the project and that ESI had contracted with Era Valdivia and/or the City to perform various inspection and labor work associated with the project. Count IV alleges the same theories of negligence against ESI as count I does against the City.

¶ 9        In its answer, the City denied that it was negligent and raised four affirmative defenses: for the first three defenses, the City alleges that it was immune pursuant to sections 3-102(a), 2-201, and 3-108(a) of the Local Governmental and Governmental Employee Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/2-201, 3-102(a), 3-108(a) (West 2010)), respectively, and for the fourth affirmative defense, the City alleges that plaintiff was guilty of contributory negligence.

¶ 10       In their answers, ESI and Milhouse also denied that they were negligent and raised affirmative defenses that Era Valdivia, plaintiff's employer, had a duty to properly train, supervise, and oversee plaintiff and was negligent; and that plaintiff was guilty of contributory negligence. ESI and Milhouse further allege that any damages sustained by plaintiff resulted, in whole or in part, from an intervening and/or superseding cause.

¶ 11       Milhouse brought a counterclaim for contribution against the City and ESI and brought a third-party complaint against Era Valdivia, plaintiff's employer. The City also brought a counterclaim for contribution against Milhouse and ESI and brought a third-party complaint against Era Valdivia. Finally, ESI brought a counterclaim for contribution against the City and Milhouse and brought a third-party complaint against Era Valdivia.

¶ 12                                II. Discovery

¶ 13       The parties attached the following transcripts from discovery depositions to their motions for summary judgment and responses: (1) plaintiff; ESI employees (2) Kent Williams, (3) James Sullivan, and (4) Kevin Hayes; (5) City employee Chuck Shum; (6) Milhouse employee Damien McIntosh; and Era Valdivia employees (7) Gregory Bairaktaris, and (8) Alex Valdivia.

¶ 14                                      A. Plaintiff

¶ 15          In his discovery deposition, plaintiff testified that he began a three-year apprenticeship with Era Valdivia, a painting contractor, shortly after graduating high school.  He had studied safety protocols and had taken the Occupational Safety and Health Administration's (OSHA) 10-hour safety course.

¶ 16          Plaintiff testified that Era Valdivia began working on the bridge project approximately three weeks before his September 2, 2010, accident. At that time, plaintiff and Jesus Valdez, another Era Valdivia employee, informed Victor Valdivia, their supervisor, that they needed a safety cable and net in order to safely work beneath the bridge. They showed Valdivia where they needed the cable, but he indicated that a cable was unnecessary. Plaintiff testified that an inspector[2] had also examined the area and believed that a cable was necessary, but Valdivia disagreed. Plaintiff explained that the purpose of a cable would have been to tie his lanyard[3] to it. When he worked above the bridge, the lanyard could be tied to the bridge's rails, so a cable was unnecessary, but a cable was required for fall protection when working beneath the bridge.

¶ 17          Plaintiff testified that when he worked on the underside of the bridge, he entered through a bridge house door on the northeast side of the bridge. There were stairs leading down "two levels," leading to a platform with a door approximately 10 feet away on the other side of the platform. Through the door were approximately four stairs leading up, followed by a 10-foot-long platform and four stairs leading down. The platform area contained "grease and rust"

_____

[2] Plaintiff did not know the inspector's name or employer and could not describe the inspector's appearance. The inspector drove a white pickup truck.

[3] According to OSHA, a lanyard is "[a] flexible line of rope, wire rope, or strap which generally has a connector at each end for connecting the body belt or body harness to a deceleration device, lifeline, or anchorage." Occupational Safety & Health Administration, https://www.osha.gov/SLTC/etools/construction/glossary html (last visited Aug. 7, 2015).

from the bridge works. After the four stairs leading down, there was a 2 by 10 wood plank, followed by a piece of metal approximately four inches wide and five feet long, which plaintiff referred to as a "catwalk." After the catwalk were more stairs, leading to concrete.

¶ 18    On the night of his accident, plaintiff was working with Daniel,[4] another Era Valdivia employee, on top of the bridge, stretching a cable for tarps that they were installing to cover the bridge. Plaintiff testified that they worked from 5 p.m. to 5 a.m. due to restrictions on when the bridge could be closed. After completing their work, plaintiff and Daniel went underneath the bridge in search of Victor Valdivia. Plaintiff followed Daniel, and made it to the 2 by 10 plank of wood without incident. In order to step onto the catwalk, plaintiff needed to step over a three-foot high object.[5] When he attempted to do so, he slipped and he fell 25 to 30 feet to the pit[6] below.

¶ 19    Plaintiff testified that there was grease or oil in the area that caused him to fall, which came from the machinery that opened the bridge. Plaintiff had worked in that area before, walking that same path "a lot of times," and had observed that it was oily and rusty. The oil collected in patches, but there was no way for plaintiff to avoid the patches. There was no railing in the area to hold, so plaintiff would hold onto the wall for balance. Plaintiff was not involved in cleaning up any of the oil, nor was anyone from Era Valdivia involved in cleaning up the oil. After plaintiff observed the oil underneath the bridge, he again raised the issue of safety cables with Victor Valdivia, who responded " 'Just be careful.' " At the time of his accident, plaintiff was wearing a harness, but was not connected to a cable.

---

[4] The record does not indicate Daniel's last name.

[5] Plaintiff did not know what the object was.

[6] The Washington Street Bridge is known as a "bascule bridge," which is a type of bridge that uses counterweights to assist in the vertical movement of the bridge leaf. Chicago Loop Bridges, http://chicagoloopbridges.com/Ctype.html (last visited Aug. 7, 2015). The counterweight and lifting machinery of the bridge is located in an area below the road surface at the river's edge known as a "tail pit." Chicago Loop Bridges, http://chicagoloopbridges.com/background12/definitions.html (last visited Aug. 7, 2015).

¶ 20    As a result of the fall, plaintiff suffered a fractured wrist and elbow, a torn bicep, an infection in the wrist caused by the dirty water he fell into, and a slipped disc in his back.[7] He has been off of work since the accident.

¶ 21                              B. ESI Witnesses

¶ 22                              1. Kent Williams

¶ 23    In his discovery deposition, Kent Williams, an engineer technician from ESI, testified that ESI's function on the project was "to be the City's eyes and ears on a daily basis." Williams' duties included supervising and overseeing projects, ensuring that the contractors were performing their duties, and completing paperwork. He did not perform quality control, and he was not involved in the contracting process between ESI and its subcontractors or contractors. Williams testified that Milhouse was ESI's subconsultant and would fill in as needed and perform the same tasks as he did.

¶ 24    Williams testified that the project began on September 1, 2010, and he was not involved in any preparation work prior to that date. He did not recall if he was involved in any presite inspection and did not recall a presite survey and review. He did not perform an inspection prior to the start of work to determine if there were any OSHA violations.

¶ 25    Williams would be present at the project site daily. He and Damien McIntosh, a Milhouse employee, would split time at the site and he would work the day shift, typically 10 to 12 hours. When he arrived at the site he would usually talk with the foreman and sometimes meet with McIntosh. The majority of Williams' day was spent observing Era Valdivia employees working, but that did not involve safety issues. He was not at the Washington

---

[7] Plaintiff testified that he suffered from an additional back injury but did not know what it was called.

bridge project all day because he was involved in another project at the same time. He did not observe City employees at the site on a daily basis.

¶ 26       Williams testified that ESI did not have a role in jobsite safety of the contractors. If he observed someone doing something unsafe, he had no authority to call it to the attention of the worker or to stop the work; it was the contractor's responsibility. He testified that ESI had no contractual obligation to provide safety warnings to a subcontractor or contractor. He did not have any safety discussions with any Era Valdivia contractor.

¶ 27       Williams was not present when the fall occurred. He believed someone, possibly City employee Chuck Shum, instructed him to obtain an accident report from Era Valdivia. He testified that he believed Shum also instructed him to take photographs of the area where the fall occurred.

¶ 28       Williams did not recall having any conversations with anyone with respect to safety, harnesses, or lanyards.  He never stopped work on the project but believed Era Valdivia briefly stopped work after the fall. He did not recall Era Valdivia doing anything incorrectly while the work was in progress. Before the work was completed, he visited the worksite and did not recall observing any grease or trash in the areas where the contractors were working.

¶ 29       Williams testified that he did not recall anyone telling him specifically that part of his job was to perform general safety reviews of the site, unless it was possibly safety reviews for the public. He did not recall reading the "scope of work" document in ESI's contract with the City, which stated that ESI should perform general safety reviews.

¶ 30                              2. James Sullivan

¶ 31       At his discovery deposition, James Sullivan testified that he worked as a construction services manager at ESI from February 2009 until February 2011. He was the resident

engineer on the project; he did not do any field inspection but was involved with project management administration. Sullivan did not have any involvement in negotiating the contract between ESI and the City. He testified that ESI was the City's representative on the project. Sullivan testified that the subcontract between ESI and Milhouse designated how many hours Milhouse would work on the project and required that Milhouse would meet the same requirements the City had imposed on ESI, concerning performance of work, insurance, etc.

¶ 32    Sullivan attended a preconstruction meeting but did not recall if the attendees discussed a safety plan. Prior to work beginning on the project, he did not perform any type of preconstruction inspection and did not know if anyone did from ESI. Sullivan would visit the field office every two to three weeks and discuss job progress and budget with Williams. He also met with McIntosh a few times to discuss his duties on the project.

¶ 33    He testified that he would have informed Williams of his duties for the project, and Williams would have reviewed the contract between the City and Era Valdivia. Sullivan testified that Williams was not responsible for the safety of Era Valdivia's workers.

¶ 34    Sullivan testified that ESI would review traffic control on projects, which relates to public safety. ESI did not have a site-specific safety plan for Era Valdivia. He testified that the standard specifications for road and bridge construction[8] were specific about the fact that consultants and the City are not responsible for the contractor's enforcement of OSHA regulations or their safety plans.

¶ 35    Sullivan testified that he was informed about plaintiff's fall the next morning. He did not go to the project site to investigate the fall and did not recall having any personal

---

[8] The standard specifications for road and bridge construction are found in a publication by the Illinois Department of Transportation (IDOT).

9

conversations about the fall with any City employee. Sullivan testified that after an accident he would want to be notified as soon as possible to know if there was anything he needed to do to follow up, and in this particular situation he did not believe the City, ESI, or Milhouse was liable, so he would have just told them to document the fall. He would not have conducted an investigation.

¶ 36    Sullivan testified that after the fall, there was a mandatory conference call, which included a discussion on emergency contact procedures, but he did not recall any discussion about jobsite safety during that call. He was not aware of any changes made after the fall to prevent future accidents.

¶ 37                                3. Keith Hayes

¶ 38    At his discovery deposition, Kevin Hayes testified that he is an architect and has a degree in architecture from University of Wisconsin-Milwaukee. He has taken various seminars through the Illinois Department of Transportation (IDOT) related to roadway engineering, but he has no formal OSHA training.

¶ 39    Hayes testified that ESI performs road and transportation engineering services, which includes planning, design, and construction services, and Hayes had been employed as a vice president with ESI since May 2009.  He directly supervised six individuals, including Kent Williams, and his role at ESI included managing the Chicago office and managing the construction services work in the northern part of Illinois. His role also included business development, writing proposals, and conducting the general business of the firm.

¶ 40    Hayes testified that he went to the project a few times to talk with his staff. He did not have any involvement in negotiating the contract between ESI and the City, but did negotiate the cost for work orders between ESI and the City. He did not do any inspection of the site

10

prior to work beginning at the project. Hayes testified that he did not recall any meetings or discussions with Williams or McIntosh prior to the start of construction regarding workplace safety and never discussed safety with any representative of Era Valdivia.

¶ 41    Hayes learned of the fall from a telephone call from Christopher Kent from the City. After that conversation, he contacted Williams and McIntosh, and they briefed Hayes on the fall and forwarded documents. He did not visit the jobsite to investigate the fall. After the fall, he led a conference call to discuss job safety and emergency procedures, but did not recall the discussion.

¶ 42    Hayes testified that he was familiar with Era Valdivia's contract with the City, and that the IDOT publication called "Standard Specifications for Road and Bridge Construction" was incorporated into that contract. It was his understanding that there is a standard specification that states that the City and the engineering consultant are not responsible for a painting contractor's safety. Pursuant to ESI's contract with the City, it was not ESI's obligation to oversee Era Valdivia's contractors in their safety practices and procedures; ESI would review Era Valdivia's work, but would not tell Era Valdivia how to conduct the work. ESI did have some role with overseeing safety issues that could impact the general public, but it did not have anything specifically to do with safety relevant to the contractors and their employees. If an ESI employee noticed a contractor was engaging in blatantly obvious unsafe work, he or she would notify the contractor but would not necessarily notify the City unless the violation was serious.

¶ 43                                C. Chuck Shum

¶ 44    At his discovery deposition, Chuck Shum testified that he is a civil engineer employed by the City for 26 years with a degree in industrial engineering from the University of Illinois at

Chicago. He also took a few courses in construction management at the Illinois Institute of Technology, but does not have OSHA training. His job duties include supervising the consultant working for the City doing the construction management, supervising the consultant and contractor but not any City employees directly. He confirms whether the contractor is doing work according to the contract and that the consultant supervises the work. He had contact with Williams from ESI, McIntosh from Milhouse, and Victor Valdivia and Gregory Bairaktaris from Era Valdivia. Shum testified that Milhouse and ESI's responsibilities were to ensure that Era Valdivia was doing everything required under its contract with the City.

¶ 45    Shum testified that there was a preconstruction meeting with Williams, McIntosh, Valdivia, and Bairaktaris where they discussed how to protect the bridge machinery and electrical equipment and the construction schedule. He did not have any meetings with the consultants or contractors with respect to safety.

¶ 46    Shum testified that safety was not the City's responsibility, and the City did not require a site-specific safety plan. Shum did not have any role on this project with respect to jobsite safety; safety was the contractor's responsibility. The contractor was responsible for determining what the workers needed for safety. He testified that if he observed anything unsafe he would inform the foreman. He testified that if he observed grease and slippery surfaces at the preconstruction meeting, he would tell the contractor to clean it up because it was the contractor's responsibility to keep the site clean. Shum testified that he never instructed the painters how to access various portions under the bridge and that was not something ESI told the painters.

12

¶ 47    Shum testified that he had the authority to stop work if he observed something hazardous or dangerous at a jobsite. He had the ability to shut down the whole project. He could also direct the consultant to withhold pay if work had not been completed; however, he has never had an instance where he did not pay someone if there was a safety issue.

¶ 48    When the bridge was being renovated, he would drive by the site almost every day. He would sometimes stop and observe. He never observed any safety hazards or unsafe work practices.

¶ 49    Shum testified that he was informed about the fall around 6 a.m. from news on the Internet. Following the fall, he spoke with Williams, Kent, Bairaktaris, and McIntosh, and he asked Williams and Victor Valdivia for an accident report. Shum testified that he visited the jobsite at some point after the fall and went down under the deck of the bridge.

¶ 50    Shum testified that the bridge is the City's property, and the City has the authority to decide how the work will be performed.

¶ 51                    D. Damien McIntosh

¶ 52    At his discovery deposition, Damien McIntosh testified that he began working for Milhouse on March 15, 2007, as an engineer technician. His duties included inspecting construction work to determine if it was completed according to the plans and specifications. At the Washington Street Bridge project, he worked the night shift and his job was to inspect and ensure that the bridge was painted properly.  His understanding was that Era Valdivia's role was to remove the lead-based paint and repaint the bridge, and that ESI was its supervisor and also inspected the bridge.

¶ 53    McIntosh and Williams had performed an initial inspection of the bridge, including street level and underneath the bridge. The purpose of this walkthough was to observe the working

area. He did not recall observing a catwalk, but did recall that the surface on which he was walking was clear and obstruction free.

¶ 54    McIntosh testified that he would interact with Victor Valdivia at the jobsite and Victor would inform him of the number of people who were working on a given day and what they were working on. McIntosh also testified that Shum would come to the job site and he would engage in small talk; he did not discuss specifics of the project with Shum. He recalled occasionally accompanying Shum around the surface of the bridge, the bridge deck, and the electrical room. He did not recall accompanying Shum to the undercarriage of the bridge.

¶ 55    McIntosh did not recall observing any grease or oil on any platformed areas. McIntosh had not discussed any of Era Valdivia's preparation work, such as setting up catwalks. When the preparation work was being done he was on the deck, making sure traffic was moving and making sure nothing was falling in the river. He had observed the painters wearing safety harnesses while walking on the bridge deck. He assumed the painters did not take the harnesses off when they went to the undercarriage, but he did not recall observing painters wearing harnesses while on the undercarriage. If he had observed any painters working on the undercarriage without wearing safety equipment, he would have told them they needed to "tie off." He would have told Williams about the incident and would have noted it in his report. No workers ever told him they were not allowed to tie off.

¶ 56    McIntosh testified that he did not have the ability to stop the painters if he observed unsafe work practices; he could make a suggestion or speak to the foreman, and he would always document the situation. If the foreman did not stop the unsafe work, he testified that he could speak with Williams.

14

¶ 57    On the date of the fall, September 2, 2010, he recalled leaving the bridge and proceeding to the field office and emailing his daily reports to Williams. After the fall, he called Williams and left a voicemail. Williams called back the next morning and asked McIntosh to prepare a report about what happened. He filled out an accident report, in which he stated that he was doing paperwork and went to the site when he observed flashing lights. Victor Valdivia had informed him that one of the laborers had fallen into the pit and was taken to the hospital. McIntosh testified that he spoke with the police and paramedics to obtain as much information as possible so he could answer any questions.

¶ 58    McIntosh testified that there had never been a meeting regarding plaintiff's fall. He testified that no OSHA representative had spoken with him regarding the fall, that there had never been an investigation, and that he had never talked to anyone from the City about the fall. McIntosh testified that there were no regular safety meetings.

¶ 59                        E. Era Valdivia Witnesses

¶ 60                        1. Gregory Bairaktaris

¶ 61    At his discovery deposition, Gregory Bairaktaris testified that he has been a project manager at Era Valdivia for 12 years and his duties include providing job estimates. He has a degree in business and a coat[9] and inspection certification from the National Association of Core Engineers (NACE). To bid on a job, he first attends a general meeting held by the City. If he is interested he buys a three-set binder, which includes the contract, the provisions of the contract document, and the description of the work with a set of prints. After reviewing the documents and inspecting the exterior of the project site, he submits a bid. Bairaktaris

---

[9] Coating is similar to painting, but as Bairaktaris said in his deposition, "[w]e are not painters, we are coaters."

testified that Jay Orlando was his contact for questions while reviewing the project information. He did not recall ever discussing safety with Orlando.

¶ 62        Bairaktaris testified that with regards to safety, all the workers were trained through the union and Era Valdivia provided the necessary safety equipment. He testified that Era Valdivia also reminded its workers about safety at weekly jobsite meetings. Shum did not direct Era Valdivia workers how to work safely or how to do their work.

¶ 63        He testified that the means and methods of how they did their work were entirely up to Era Valdivia, which included how they sandblasted and painted and how they set up safety cables, tied off, and accessed certain parts of the bridge. Era Valdivia did not rely on ESI or Williams to tell its workers how to access the bridge. Era Valdivia decided where to place the safety cables and installed them; ESI did not have anything to do with that decision. He testified that if there was grease at the worksite, he would not expect ESI to clean the grease.

¶ 64        Bairaktaris testified that he first learned about the fall a few days after it occurred. He spoke with Alex Valdivia and prepared an accident report based solely on that conversation. He had not reviewed any documents or had any other conversations prior to preparing the report. He wrote that a contributing factor was "[p]ossible grease/moisture spot on catwalk," and the incident could be prevented in the future by "[m]ark[ing] authorized work areas and review with workers," which suggested that plaintiff was possibly in an unauthorized area, but Bairaktaris did not know.

¶ 65        Bairaktaris testified that he visited the bridge a few days after the fall and went under the bridge with Alex Valdivia. They discussed working safely, tying off, reminding the workers of their safety training, and the job status. He also spoke with Williams after the fall about safety and testified that in his opinion, ESI's role was "not just to quality control the site, it's

16

also there to observe, control with respect to what is written in the contract. Part of the contract is safety." He clarified that this meant the consultants needed to practice the same safety requirements as Era Valdivia and told Williams that if he observed something unsafe to bring it to Era Valdivia's attention. He did not have a similar conversation with McIntosh or anyone from the City.

¶ 66                                     2. Alex Valdivia

¶ 67        At his discovery deposition, Alex Valdivia testified that he has worked for Era Valdivia for 12 years and is currently in quality control. His job entails the assurance and inspection of the work and documentation. Valdivia testified that prior to the fall, he had not had a safety plan review meeting with anyone from the City. Every day he held a toolbox safety discussion with the workers and discussed the work plans for the day and safety. No one from the City, ESI, or Milhouse attended those meetings.

¶ 68        He testified that Era Valdivia employees were instructed to climb over the box beam with a lanyard and harness. There were safety cables on the underside of the bridge and catwalk area. He had walked in the same area as the accident site and did not notice any grease or other residue buildup in the area.

¶ 69        The night of the accident, Valdivia was walking around the area at street level when he heard Daniel, one of Era Valdivia's employees, shouting, so he went down where plaintiff and Daniel had been walking and learned that plaintiff had fallen. He spoke with Daniel; notified the foreman, Victor; called fire rescue; and notified Era Valdivia. Valdivia testified that plaintiff had a lanyard and harness, but he did not know if plaintiff had the harness attached. Valdivia testified that he reminds workers on a daily basis about safety on the

17

jobsite. That night, he had told the workers that they were required to tie off when they are in a dangerous area.

¶ 70        Valdivia testified that he performed a preliminary investigation, when he spoke with plaintiff while he was in the pit. Plaintiff told him that "[h]e was trying to get to an area and he was going underneath the beam, and he lost his footing and tried to hold on to something but couldn't hold on and went down." Plaintiff did not mention anything about grease or rust. Valdivia testified that he had instructed the workers to climb over the beam instead of going under the beam because by going over, there were structures to tie off to. He assumed plaintiff had not tied off but did not ask why he had not tied off. After the fall, he ordered that extra netting be placed as an extra precaution; the City did not instruct him to install extra netting.

¶ 71                                III. Contracts

¶ 72        There were several contracts relevant to the issues in the instant case. The first contract was the City's July 27, 2007, contract with ESI. The relevant portion of the contract is the "Scope of Services" section, which states:

> "A. Task Order Roadway Construction Engineering Services
>
> The scope of work of the project is the rehabilitation and reconstruction of arterial and/or residential streets in the City of Chicago. The scope of the construction includes, but is not limited to, roadway rehabilitation and reconstruction, sidewalk removal and replacement, installation of ornamental lighting, sewer lining and/or replacement, installation of duct packages for various utilities, traffic signal modernization and interconnects, streetscape elements and landscaping. The construction engineer's methodology and procedures to maintain project schedule

18

must be completely addressed and explained in the proposal. Special emphasis must be placed upon minimizing disruption to neighborhoods and businesses along the project, and keeping construction sites as accessible and cleaned-up as possible. Further, the time interval between sidewalk/ADA ramp removal and replacement must be kept to an absolute minimum. CDOT seeks Phase III construction engineering services for this work. The projects will be administered by the CDOT Division of Engineering."

Phase III services included "Develop General Safety Review Plan" in the preconstruction phase and "Perform General Safety Reviews of Site."

¶ 73    The City also contracted with Era Valdivia, and the relevant portions of that contract state:

"F. Precautions and Safety

1. You must take any precautions that may be necessary to render all portions of the Work secure in every respect, to decrease the liability of accidents from any cause and to avoid contingencies that are liable to delay the completion of the Work. You must furnish and install, subject to the approval of the Commissioner, all necessary facilities to provide safe means of access to all points where Work is being performed and make all necessary provisions to insure the safety of workers and of engineers and inspectors during the performance of the Work ***.

2. Although the Commissioner may observe the performance of the Work and reserves the right to give opinions and suggestions about safety defects and deficiencies, the City is not responsible for any unsafe working conditions. The Commissioner's suggestions on safety, or lack of it, will in no way relieve you of

19

your responsibility for safety on the Work site. You have sole responsibility for safety and the obligation to immediately notify the Commissioner of all accidents.

\*\*\*

G. Health, Safety, and Sanitation

1. Clean up \*\*\* You must clean off all cement streaks or drippings, paint smears or drippings, rust stains, oil, grease, dirt and any other foreign material deposited or accumulated on any portion of your Work, or existing facilities and structures, due to your performance of the Work.

\*\*\*

Submittals \*\*\* The Contractor shall not construe Engineer's acceptance of the submittals to imply approval of any particular method or sequence conducting the work, or for addressing health and safety concerns. Acceptance of the programs does not relieve the Contractor from the responsibility to conduct the work according to the requirements of Federal, State, or Local regulations and this specification, or to adequately protect the health and safety of all workers involved in the project and any members of the public who may be affected by the project. The Contractor remains solely responsible for the adequacy and completeness of the programs and work practices, and adherence to them.

\*\*\*

Inspection Access and Lighting. The Contractor shall facilitate the Engineer's observations as required, including allowing ample time to view the work. The Contractor shall furnish, erect and move scaffolding or other mechanical equipment to permit close observation of all surfaces to be cleaned and painted. \*\*\* When the

20

surface to be inspected is more than 6 ft. (1.8 m) above the ground or water surface, and fall protection is not provided (e.g., guardrails are not provided), the Contractor shall provide the Engineer with a safety harness and a lifeline according to OSHA regulations."

The Illinois Department of Transportation's publication titled "Standard Specifications for Road and Bridge Construction" was incorporated into the contract and states:

"107.28 Contractor Safety Responsibility. Nothing in this contract or the contracts between the Department and any construction engineering consultant(s) is intended or shall be construed, unless otherwise expressly stated, to reduce the responsibility of the Contractor, a subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, from full and complete supervision and achievement of work place safety. Any inspection of the work conducted by the Department, the construction engineering consultant(s), and the officers and employees of any of them, whether notice of the results thereof is provided to anyone or not provided to anyone, shall neither establish any duty on their parts nor create any expectation of a duty to anyone, including but not limited to third parties, regarding work place safety. *** Additionally, the Contractor guarantees to the Department a safe work place shall be provided for all employees of the Contractor and each of its subcontractors."

¶ 74                                IV. Motions for Summary Judgment

¶ 75                                      A. ESI and Milhouse

¶ 76        ESI filed a motion for summary judgment on November 14, 2013; Milhouse joined in ESI's motion on November 15, 2013. ESI argued that, while plaintiff's complaint did not

specifically cite section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 414 (1965)), the complaint nevertheless invoked the section by alleging that ESI was responsible for the safety at the worksite and that it controlled the means and methods by which Era Valdivia performed its work. ESI argued that it could not be found liable for plaintiff's injuries under section 414 because it did not entrust any work to Era Valdivia and because it did not retain control of any aspect of Era Valdivia's work related to worker safety. Consequently, ESI argued that since it did not owe plaintiff a duty under section 414, summary judgment in its favor was appropriate.

¶ 77    On January 31, 2014, plaintiff filed a response to the motion for summary judgment, arguing that, as part of their contracts with the City and each other, ESI and Milhouse voluntarily undertook duties to keep the worksite clean, to perform regular safety inspections, and to review submittals for structures that would provide safe access to various parts of the worksite and further arguing that ESI and Milhouse breached those duties. Plaintiff also argued that ESI "incorrectly assert[ed]" that section 414 of the Restatement (Second) of Torts was applicable, arguing that neither section 414 nor the case cited by ESI "appl[ied] to liability for one's *own* acts of omissions" (emphasis in original).

¶ 78    Plaintiff also attached the affidavit of Scott Leopold, a structural engineer and professional engineer, to his response. In the affidavit, Leopold stated that if called to testify at trial, he would testify to the following opinions, which were based on his review of incident reports, contract documents, and deposition transcripts, and which were offered "to a reasonable degree of engineering and construction safety certainty." Leopold opined that, according to custom and practice, the City was a "controlling employer" on the bridge

22

project, as that term was defined by OSHA,[10] and had general supervisory authority over the jobsite and the power to require Era Valdivia to correct hazards. Leopold opined that the City failed to take reasonable precautions to ensure that employees were protected from fall hazards and failed to take reasonable precautions to remove grease from foreseeable working surfaces or to delegate cleaning to a contractor. Leopold opined that "[d]elegation of safety responsibilities to the Contractor did not relieve the City of its responsibilities for review and approval of methods and safety of access," and further opined that the City knew or should have known that oversight of jobsite safety was required to ensure that Era Valdivia would provide employees with safe access to work areas. Leopold opined that the City's "utter disregard for submittal review and safety inspections relative to access violated the standard of reasonable care for a controlling employer" and that the City "ignored its responsibility to make sure that safety inspections by the CITY and its construction manager were frequent near the beginning of the project, in light of the fall hazards associated with access to the trusses from the gear room." Leopold opined that the City's failure to properly review Era Valdivia's proposed method of access to the work area was "a root procedural cause of the occurrence" and that the City's failure to ensure that grease was removed from foreseeable walking and working surfaces was "causal to the occurrence."

¶ 79     With respect to ESI, Leopold opined that as construction manager on the project, ESI was responsible for oversight of the construction work and that "ESI's responsibility for review of submittals included review of the Contractor's proposed means and methods of providing Contractor employees with safe access to work areas." Leopold opined that "ESI did not adequately fulfill its duties for construction management and construction engineering

_____

[10] The definition provided in Leopold's affidavit indicated that a controlling employer was "[a]n employer who has general supervisory authority over the worksite, including the power to correct safety and health violations itself or require others to correct them" (emphasis omitted).

services relative to jobsite safety," opining that ESI failed to adequately perform a general safety review of the jobsite while a temporary platform was being erected and that ESI failed to adequately review the submittal for the temporary platform for safe access. Leopold opined that ESI's failure to review and approve a safe means of access to the work area was "a root procedural cause of the occurrence." Leopold expressed similar opinions concerning Milhouse.

¶ 80        On February 13, 2014, ESI filed its reply, arguing that "[p]laintiff has fundamentally misconstrued the meaning of section 414 of the Restatement (Second) of Torts and its applicability to this case." ESI argued that section 414 was applicable where a defendant entrusted work to another but retained control over some aspect of the work. However, ESI argued that the facts demonstrated that ESI did not entrust any work to Era Valdivia and did not exercise control over Era Valdivia, meaning that it owed no duty to plaintiff under section 414. ESI also argued that it did not owe a duty to plaintiff through a voluntary undertaking. Finally, ESI argued that Scott Leopold's affidavit should be stricken because it contained improper conclusions of law and interpretations of contract language.

¶ 81        On March 7, 2014, the trial court granted ESI and Milhouse's motion for summary judgment. The court found that ESI and Milhouse did not owe plaintiff a duty under section 414 and also found that ESI and Milhouse had no contractual relationship with Era Valdivia. The trial court also found that nothing in ESI's contract placed a duty on it to clean oil and rust or any duty of general work site safety, and the contractual provisions cited by plaintiff did not impose a duty on worker and work site safety, but had to do with "cleanliness and accessibility of neighborhoods, businesses, and public locations." It also found that there was no evidence ESI or Milhouse retained control over plaintiff's work or worksite safety and

24

there was no evidence that ESI or Milhouse had a duty to inspect for OSHA compliance. Finally, the trial court found that Era Valdivia's contract with the City placed the responsibility for safety and cleanup on Era Valdivia. Additionally, the trial court found that because there was no evidence ESI or Milhouse caused the oil and rust on the bridge, no duty arose. Finally, the trial court struck the affidavit of Scott Leopold because his "opinions therein [were] merely his interpretations of the contract language and conclusions of law."

¶ 82       On April 3, 2014, plaintiff filed a notice of appeal, which was assigned case number 1-14-0933.

¶ 83                                    B. The City

¶ 84       The City filed a motion for summary judgment on December 12, 2013, raising three alternative bases for summary judgment. First, the City argued that it was absolutely immune from liability under section 2-201 of the Tort Immunity Act (745 ILCS 10/2-201 (West 2012)). In the alternative, the City argued that it was immune from liability for plaintiff's negligence claim under section 3-108(a) of the Tort Immunity Act (745 ILCS 10/3-108(a) (West 2012)). Finally, in the alternative, the City argued that the City did not owe plaintiff a duty because the City did not control Era Valdivia employees with respect to safety.

¶ 85       Plaintiff filed a response on January 31, 2014, arguing that the City had retained control of the worksite and had a duty to supervise the site with care, which it did not do. Plaintiff also argued that section 2-201 was inapplicable because plaintiff's claims were not related to the City's discretionary or policy-making decisions. Finally, plaintiff argued that under section 3-108(a), willful and wanton conduct was a question of fact for the jury. Plaintiff also attached Leopold's affidavit, described above, to its response.

25

¶ 86    On June 8, 2014, the trial court granted summary judgment in the City's favor and on June 19, 2014, plaintiff filed a notice of appeal, which was assigned case number 1-14-2102.

¶ 87    The two appeals were consolidated on September 4, 2014.

¶ 88                                ANALYSIS

¶ 89    On appeal, plaintiff argues that the trial court erred in granting summary judgment in defendants' favor on a number of bases. Plaintiff argues that the trial court erred in granting summary judgment in favor of ESI and Milhouse (1) because it applied section 414 vicarious liability principles in analyzing their contractual duties, (2) because it found ESI and Milhouse had no contractual duties to keep the work site clean and perform safety reviews, and (3) because ESI and Milhouse had voluntarily assumed a duty to ensure Era Valdivia workers' safety. Additionally, plaintiff argues that the trial court erred in granting summary judgment in favor of the City (1) because it determined there was no gross or wanton negligence and (2) because it determined the City had no duty to supervise the contractors. Finally, plaintiff argues that the trial court erred in striking the affidavit of Scott Leopold. We consider each argument in turn.

¶ 90    A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same

26

analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 91     "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). A defendant moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The defendant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). In other words, there is no evidence to support the plaintiff's complaint.

¶ 92     " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 93                                   I. ESI/Milhouse

¶ 94     With respect to ESI and Milhouse,[11] plaintiff argues that the trial court erred in applying section 414 vicarious liability principles when it should have analyzed the agreements using contractual interpretation and further argues that the trial court erred in interpreting ESI's and Milhouse's contracts. Plaintiff also argues that summary judgment in favor of ESI and

---

[11] As it did before the court below, Milhouse has adopted ESI's brief on appeal. Accordingly, any arguments made by ESI on appeal apply equally to Milhouse.

Milhouse was inappropriate because there was a question of fact regarding whether they voluntarily assumed a duty to plaintiff.

¶ 95                    A. Section 414 of the Restatement (Second) of Torts

¶ 96    Plaintiff first argues that the trial court erred in applying section 414 because he had alleged that ESI and Milhouse were directly liable for breaching contractual duties and had not alleged a claim of vicarious liability. In order to properly understand plaintiff's argument and ESI's response to it, it is necessary to briefly discuss the scope of section 414.

¶ 97    "The essential elements of a cause of action based on common-law negligence are the existence of a duty owed by the defendant to the plaintiff, the breach of that duty, and the injury proximately caused by that breach." *Cochran v. George Sollitt Construction Co.*, 358 Ill. App. 3d 865, 873 (2005) (citing *Ward v. K mart Corp.*, 136 Ill. 2d 132, 140 (1990)). "Section 414, which has long been recognized as an expression of law in Illinois [citation], articulates the duty of those who employ independent contractors." *Cochran*, 358 Ill. App. 3d at 873 (citing *Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 325 (1965)).

¶ 98    "Generally, one who employs an independent contractor is not liable for the latter's acts or omissions." *Joyce v. Mastri*, 371 Ill. App. 3d 64, 73 (2007) (citing *Downs v. Steel & Craft Builders, Inc.*, 358 Ill. App. 3d 201, 204-05 (2005)). However, section 414 of the Restatement (Second) of Torts provides an exception to the general rule, referred to as the "retained control" exception. *Cochran*, 358 Ill. App. 3d at 873-74; *Calloway v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 112746, ¶ 47.

¶ 99    Section 414 provides:

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose

28

safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965).

¶ 100    "The Restatement describes a continuum of control, explaining [that] the employer is subject to liability as master under the principles of agency where the employer retains control over the operative detail of any part of the contractor's work. [Citation.] If the employer retains only supervisory control, *i.e.*, power to direct the order in which work is done, or to forbid its being done in a dangerous manner, then the employer is subject to liability under section 414 unless he exercised supervisory control with reasonable care." *Martens v. MCL Construction Corp.*, 347 Ill. App. 3d 303, 314 (2004) (citing Restatement (Second) of Torts § 414, cmt. a (1965)). Thus, "[a]s comment *a* to section 414 clarifies, the general contractor, by retaining control over the operative details of its subcontractor's work, may become vicariously liable for the subcontractor's negligence; alternatively, even in the absence of such control, the general contractor may be directly liable for not exercising his supervisory control with reasonable care." *Cochran*, 358 Ill. App. 3d at 874.

¶ 101    In the case at bar, plaintiff is concerned only with ESI's and Milhouse's direct conduct and does not make any claims regarding vicarious liability. Indeed, plaintiff states several times in his brief on appeal that "vicarious liability is not at issue." Accordingly, we have no need to consider whether vicarious liability and its retained control exception would apply in the instant case. See *O'Gorman v. F.H. Paschen, S.N. Nielsen, Inc.*, 2015 IL App (1st) 133472, ¶ 90 (where the plaintiffs made no arguments concerning vicarious liability in their brief, "we do not consider it in our analysis").

¶ 102    However, as he did below, plaintiff also argues that "[b]ecause vicarious liability is not at issue in these allegations, neither is Section 414." Despite plaintiff's contention to the contrary, however, we have applied section 414 in considering direct liability as well as vicarious liability. As noted, "the general contractor may be directly liable for not exercising his supervisory control with reasonable care," even in the absence of control sufficient to subject the general contractor to vicarious liability. *Cochran*, 358 Ill. App. 3d at 874. See also *O'Gorman*, 2015 IL App (1st) 133472, ¶¶ 91-101 (analyzing whether there was direct liability under section 414 in case where vicarious liability was not argued).

¶ 103    Nevertheless, plaintiff is correct that the instant case is not one in which section 414 liability is implicated. "Whether a duty exists under section 414 turns on whether the defendant entrusted work to an independent contractor and yet retained control of any part of the independent contractor's work." *Calloway v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 112746, ¶ 50. "Thus, the prerequisite for applying [section 414] is entrustment of work to an independent contractor by the defendant, absent which section 414 is inapplicable and the issue of control *** is never reached." *O'Connell v. Turner Construction Co.*, 409 Ill. App. 3d 819, 822 (2011). In the case at bar, the parties agree that neither ESI nor Milhouse entrusted any work to Era Valdivia. Thus, we cannot find that ESI or Milhouse entrusted work to Era Valdivia and yet "retained control" over Era Valdivia's work such that they would owe a duty to plaintiff under section 414. *O'Connell*, 409 Ill. App. 3d at 823.

¶ 104                    B. Tort Duty Based in Contract

¶ 105    Plaintiff next argues that he had alleged a theory of direct liability based on the language of ESI's and Milhouse's contracts and the trial court erred in interpreting those contracts. In

response, ESI argues that plaintiff forfeited this argument because he never raised it in the trial court.

¶ 106 An argument that has not been raised in the trial court cannot be raised for the first time on appeal, even in the case of summary judgment. *Benson v. Stafford*, 407 Ill. App. 3d 902, 919 (2010) (citing *Lajato v. AT&T, Inc.*, 283 Ill. App. 3d 126, 136 (1996)). However, we do not find persuasive ESI's argument that plaintiff forfeited this argument. Plaintiff raised the issue of a contractual duty in his response to ESI's motion for summary judgment and the trial court ruled on the issue. Plaintiff did not raise a new issue on appeal, as ESI contends, but only argued the trial court erred in its method of contractual interpretation.

¶ 107 Nevertheless, we cannot agree with plaintiff's argument that ESI's and Milhouse's contracts established a duty to maintain worksite cleanliness and perform safety reviews and that their breach proximately caused plaintiff's injuries. As noted, in the case at bar, Milhouse, as ESI's subcontractor, agreed to be bound by the same duties as ESI. Accordingly, we consider whether ESI owed a duty with regard to worksite cleanliness and safety.

¶ 108 Plaintiff cites two provisions of ESI's contract that purportedly establish ESI's and Milhouse's duties regarding work site cleanliness and safety. The first provision reads:

"The scope of work of the project is the rehabilitation and reconstruction of arterial and/or residential streets in the City of Chicago. The scope of the construction includes, but is not limited to, roadway rehabilitation and reconstruction, sidewalk removal and replacement, installation of ornamental lighting, sewer lining and/or replacement, installation of duct packages for various utilities, traffic signal modernization and interconnects, streetscape elements and landscaping. The

31

construction engineer's methodology and procedures to maintain project schedule must be completely addressed and explained in the proposal. *Special emphasis must be placed upon minimizing disruption to neighborhoods and businesses along the project, and keeping construction sites as accessible and cleaned-up as possible.* Further, the time interval between sidewalk/ADA ramp removal and replacement must be kept to an absolute minimum. CDOT seeks Phase III construction engineering services for this work. The projects will be administered by the CDOT Division of Engineering." (Emphasis added.)

¶ 109    The trial court interpreted this provision to mean that ESI and Milhouse did not have a duty with respect to worker or worksite safety, but did have a duty with regard to cleanliness and accessibility of neighborhoods, businesses, and public locations. Although plaintiff claims it would be an absurd result to interpret "construction sites" to mean "neighborhoods, businesses, and public locations," and not include the area where construction was occurring, plaintiff has ignored the context surrounding the phrase "construction sites."

¶ 110    The section of the contract cited by plaintiff is unambiguous. It does not impose a duty on ESI to keep the undercarriage of the bridge clean and accessible. Rather, the section discusses the effect of the construction on the public and instructs ESI to ensure the construction disrupts the neighborhoods and businesses as little as possible. This section is concerned about keeping the area clean and accessible to the public, which is further evidenced by the next sentence that discusses accessibility under the Americans with Disabilities Act. The undercarriage of the bridge is not accessible to the public and therefore, this section is not applicable to maintaining the cleanliness and accessibility of the

undercarriage. Furthermore, plaintiff does not explain how this section imposes a duty on ESI and Milhouse to ensure Era Valdivia workers' safety.

¶ 111    The second provision plaintiff cites that purportedly establishes a duty reads, "Perform General Safety Reviews of Site." However, performing "general safety reviews" does not rise to the level of imposing a duty on ESI and Milhouse to ensure Era Valdivia workers' safety. In fact, Williams and McIntosh both testified that if they observed an unsafe work practice, they did not have the authority to tell the worker to stop because it was Era Valdivia's responsibility.

¶ 112    We note that plaintiff cites to *Ivanov v. Process Design Associates*, 267 Ill. App. 3d 440 (1993), to support his argument that the contract imposes a duty on ESI and Milhouse. However, we find the facts of *Ivanov* distinguishable. In that case, the engineering firm, which also served as the construction manager, contracted with the owner of a building and the contract stated that the construction manager would "[a]ct as [the owner's] representative in the administration of construction contracts" and "[s]upervise and co-ordinate Contractors in the execution of their work." (Internal quotation marks omitted.) *Ivanov*, 267 Ill. App. 3d at 444. The court held that because the engineering firm "agreed to act as [the owner's] agent to oversee and direct the contractors in the execution of their work," a trial court "could properly determine [the engineering firm's] authority coexisted with [the owner's], which clearly includes the right to require that the contractors comply with safety requirements." *Ivanov*, 267 Ill. App. 3d at 444. In the case at bar, neither ESI nor Milhouse agreed to supervise Era Valdivia in the manner in which its workers accomplished their work; both Williams and McIntosh testified that their supervisory duties included inspecting the completion of work at various segments.

¶ 113                                    C. Voluntary Undertaking

¶ 114          Finally, plaintiff argues that the trial court erred in granting summary judgment in favor

of ESI and Milhouse because there was a question of fact as to whether they had voluntarily

assumed duties to keep the worksite clean, review submittals, and perform safety reviews.

We cannot find that ESI or Milhouse voluntarily assumed such a duty.

¶ 115          "[W]hether a defendant has voluntarily undertaken a duty to plaintiff is a question of law

that is properly addressed in a motion for summary judgment." *Lange v. Fisher Real Estate

Development Corp.*, 358 Ill. App. 3d 962, 973 (2005) (citing *Jakubowski v. Alden-Bennett

Construction Co.*, 327 Ill. App. 3d 627, 639 (2002)). The voluntary undertaking theory of

liability is found in section 324A of the Restatement (Second) of Torts, which states:

"Liability to Third Person for Negligent Performance of Undertaking

One who undertakes, gratuitously or for consideration, to render services to another

which he should recognize as necessary for the protection of a third person or his

things, is subject to liability to the third person for physical harm resulting from his

failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon

the undertaking." Restatement (Second) of Torts § 324A (1995).

¶ 116          We first note that in his brief, plaintiff does not cite section 324A, but again relies on

*Ivanov*. We also note that plaintiff alleges ESI and Milhouse voluntarily undertook a duty to

plaintiff based solely on their contracts. In his discussion of *Ivanov*, plaintiff states that the

appellate court reversed the trial court's grant of summary judgment because the contract

"provisions created a question of fact as to whether the defendant contractor had voluntarily assumed those duties." However, this misinterprets the appellate court's decision; the appellate court did not reverse based on the contract, but rather found "that based upon [the defendant's employee's] testimony alone, a trial court could properly determine that a genuine issue of material fact exists as to whether [the defendant] and/or [the defendant's employee] voluntarily assumed the duty to ensure safety." *Ivanov*, 267 Ill. App. 3d at 446.

¶ 117    Furthermore, we find that the trial court was correct to grant summary judgment in favor of ESI and Milhouse because there was no genuine issue of material facts regarding ESI and Milhouse voluntarily undertaking a duty to plaintiff. Our supreme court "has indicated that a 'narrow construction' of voluntary undertakings is 'supported by public policy.' " *Jakubowski v. Alden-Bennett Construction Co.*, 327 Ill. App. 3d 627, 641 (2002) (quoting *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 33-35 (1992)). In the case at bar, there is no evidence that ESI or Milhouse undertook any duty to ensure the safety of Era Valdivia workers. Unlike defendant's employee in *Ivanov*, no ESI or Milhouse employees testified that their duties involved inspecting the site for safety. Williams testified that if he observed an unsafe work practice, he could not tell the worker to stop because it was the contractor's responsibility. Likewise, McIntosh testified that if he observed an unsafe work practice, he would only make a suggestion to the worker. Accordingly, the trial court properly granted summary judgment in favor of ESI and Milhouse.

¶ 118                                              II. The City

¶ 119    Plaintiff next argues that the trial court erred in granting summary judgment for the City because it determined the City was not willfully or wantonly negligent, which was a factual

35

question that should have been resolved by the jury. Plaintiff also argues that the trial court erred in determining the City had no duty to supervise Era Valdivia.

¶ 120   The City contends that it is immune from liability for its discretionary decisions pursuant to section 2-201 of the Tort Immunity Act (745 ILCS 10/2-201 (West 2012)). Since this issue is dispositive, we address it first.

¶ 121   The Tort Immunity Act grants immunity to municipal defendants engaged in certain discretionary acts. 745 ILCS 10/2-201 (West 2012). Section 2-201 provides as follows:

> "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201 (West 2012).

Section 2-109 allows municipalities to shelter under the immunity granted to public employees covered by section 2-201. 745 ILCS 10/2-109 (West 2012) ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable.").

¶ 122   Our supreme court has held that the Tort Immunity Act sets up, in essence, a two-part test to determine which employees may be granted discretionary immunity under section 2-201. An employee may qualify for discretionary immunity "if he holds *either* a position involving the determination of policy *or* a position involving the exercise of discretion." (Emphases in original.) *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 341 (1998). However, an employee who satisfies the first prong of the test must also have engaged in *both* the determination of policy *and* the exercise of discretion when performing the act or omission from which the plaintiff's injury resulted. *Harinek*, 181 Ill. 2d at 341. Whether the

36

act or omission in question is discretionary or ministerial must be determined on a case-by-case basis. *Snyder v. Curran Township*, 167 Ill. 2d 466, 474 (1995); *Anderson v. Alberto-Culver USA, Inc.*, 317 Ill. App. 3d 1104, 1113 (2000). Governmental entities bear the burden of properly raising and proving that they are immune under the Tort Immunity Act in order to bar plaintiffs' recovery. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 370 (2003).

¶ 123    Policy determinations, as used in section 2-201, involve " 'those decisions which require the municipality to balance competing interests and to make a judgment call as to what solution will best serve each of those interests.' " *Harinek*, 181 Ill. 2d at 342 (quoting *West v. Kirkham*, 147 Ill. 2d 1, 11 (1992)). "[D]iscretionary acts are those which are unique to a particular public office, while ministerial acts are those which a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act." *Snyder*, 167 Ill. 2d at 474. Our supreme court further explored the contours of discretionary versus ministerial acts in *In re Chicago Flood Litigation*, 176 Ill. 2d 179 (1997):

" 'Official action is judicial where it is the result of judgment or discretion. Official duty is ministerial when it is absolute, certain and imperative, involving merely the execution of a set task, and when the law which imposes it, prescribes and defines the time, mode and occasion of its performance with such certainty, that nothing remains for judgment or discretion. [Citation.] A [municipal] corporation acts judicially, or exercises discretion, when it selects and adopts a plan in the making of public improvements, such as constructing sewers or drains; but as soon as it begins to carry out that plan, it acts ministerially, and is bound to see that the work is done in a

reasonably safe and skillful manner.' " *In re Chicago Flood*, 176 Ill. 2d at 194 (quoting *City of Chicago v. Seben*, 165 Ill. 371, 377-78 (1897)).

¶ 124    In *In re Chicago Flood*, the City of Chicago contracted with a dredging company to "remove and replace wood piling clusters at five Chicago River bridges" and specified in the contract the exact locations to install pilings. *In re Chicago Flood*, 176 Ill. 2d at 184. The dredging company deviated from those locations and caused a breach in an underground freight tunnel, which was discovered in January 1992. *In re Chicago Flood*, 176 Ill. 2d at 185. The City had been notified by February 1992 and had inspected the tunnel and recommended repairs, but in April 1992, the tunnel breach opened, flooding the tunnel and buildings connected to the tunnel. *In re Chicago Flood*, 176 Ill. 2d at 185. Class plaintiffs brought a lawsuit against the City and the dredging company, but our supreme court held that the City was immune pursuant to section 2-201. The court held that the "City's supervision of [the dredging company's] pile driving was discretionary rather than ministerial" because the contract authorized the City to change its specifications; "[t]hus the City retained the discretion to locate the pilings in any location it thought best." *In re Chicago Flood*, 176 Ill. 2d at 195.

¶ 125    Similarly, in the case at bar, the contract authorized the Commissioner[12] to "reject or require modification of any proposed or previously approved order of procedure, method, structure or equipment." Because of this contractual provision, the City's supervision of Era Valdivia was discretionary, meaning the City is immune pursuant to section 2-201. Accordingly, the trial court did not err in granting summary judgment in the City's favor.

_____

[12] Commissioner is defined by the contract as "the head of the Department [of Transportation] and any representative duly authorized in writing to act on his behalf."

¶ 126                                    III. Affidavit

¶ 127        Finally, plaintiff argues that the trial court erred in striking the affidavit of Scott Leopold, which was attached to both of plaintiff's responses to the motions for summary judgment, based on its conclusion that Leopold's opinions were "merely his interpretation of the contract language and conclusions of law." We note that since summary judgment in the City's favor was based on statutory immunity, the admission or exclusion of the affidavit is irrelevant with respect to the City. Accordingly, we consider only whether the trial court erred in striking Leopold's affidavit with respect to plaintiff's claims against ESI and Milhouse.

¶ 128        Affidavits filed in connection with a motion for summary judgment are governed by Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013), which provides:

            "Affidavits in support of and in opposition to a motion for summary judgment under section 2-1005 of the Code of Civil Procedure *** shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all documents upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto."

¶ 129        "Courts of review in this state have assessed a decision whether to strike a Rule 191 affidavit under both an abuse of discretion standard and a *de novo* standard." *D'Attomo v. Baumbeck*, 2015 IL App (2d) 140865, ¶ 71; *JPMorgan Chase Bank, N.A. v. East-West Logistics, L.L.C.*, 2014 IL App (1st) 121111, ¶ 81. See, *e.g.*, *Farmers Automobile Insurance Ass'n v. Neumann*, 2015 IL App (3d) 140026, ¶ 14 (applying abuse of discretion standard);

*American Service Insurance Co. v. China Ocean Shipping Co. (Americas), Inc.*, 402 Ill. App. 3d 513, 524 (2010) (applying abuse of discretion standard); *Madden v. Paschen*, 395 Ill. App. 3d 362, 386 (2009) (applying *de novo* standard). However, like the *D'Attomo* court, "[w]e need not resolve the dispute regarding the appropriate standard of review, as our result would be the same under either standard." *D'Attomo*, 2015 IL App (2d) 140865, ¶ 71.

¶ 130     In the case at bar, with respect to ESI, Leopold opined that as construction manager on the project, ESI was responsible for oversight of the construction work and that "ESI's responsibility for review of submittals included review of the Contractor's proposed means and methods of providing Contractor employees with safe access to work areas." Leopold opined that "ESI did not adequately fulfill its duties for construction management and construction engineering services relative to jobsite safety," opining that ESI failed to adequately perform a general safety review of the jobsite while a temporary platform was being erected and that ESI failed to adequately review the submittal for the temporary platform for safe access. Leopold opined that ESI's failure to review and approve a safe means of access to the work area was "a root procedural cause of the occurrence." Leopold expressed similar opinions concerning Milhouse.

¶ 131     According to his affidavit, Leopold relied on the contract documents, as well as McIntosh's deposition transcript, in reaching his conclusions about ESI and Milhouse. With respect to the issue of ESI's and Milhouse's duties, which was the basis for the trial court's grant of summary judgment, Leopold's opinion was based entirely on his interpretation of the contracts involved in the case at bar. However, "in the absence of ambiguity[,] contract interpretation is a question of law for which expert testimony would not be appropriate." *William Blair & Co. v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 338 (2005). See also

*William J. Templeman Co. v. Liberty Mutual Insurance Co.*, 316 Ill. App. 3d 379, 390 (2000) ("[A]s the construction and interpretation of an insurance policy is a question of law, we fail to see the relevance of plaintiffs' expert witness."). Accordingly, the trial court did not err in striking Leopold's affidavit as to ESI and Milhouse.

¶ 132    Plaintiff argues that Leopold opined that ESI and Milhouse breached their duties and that those breaches proximately caused plaintiff's injuries, both of which are factual matters, not questions of law. However, as noted, the trial court's grant of summary judgment was based on its conclusion that ESI and Milhouse owed no duty to plaintiff, not on consideration of the issues of breach or proximate cause. "The existence of a duty is a question of law for the court to decide." *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 114 (1995) (citing *Wojdyla v. City of Park Ridge*, 148 Ill. 2d 417, 421 (1992)). Consequently, even if plaintiff is correct and Leopold's affidavit should have been admitted in considering issues of breach and proximate cause, we can find no error in the trial court's refusal to consider Leopold's affidavit as to the legal issue of duty, which was the basis for its grant of summary judgment.

¶ 133                                CONCLUSION

¶ 134    For the foregoing reasons we affirm the trial court's grant of summary judgment in favor of ESI, Milhouse, and the City.

¶ 135    Affirmed.